# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **HOLDEN GRAVES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MISSOURI DEPARTMENT** | ) | |
| **OF CORRECTIONS,** | ) | |
| | ) | |
| **CENTURION OF MISSOURI, LLC,** | ) | |
| | ) | |
| **RICHARD ADAMS,** in his | ) | |
| individual and official capacities, | ) | **Case No.:      4:24cv-01693-NCC** |
| | ) | |
| **SGT. CONNER PROVINCE,** in his | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **C.O. COLE WICH,** in his | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **SGT. RACHEL BEDORE,** in her | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **CHASITY GRAYSON, LPN,** in her | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **LAYOTA MERRITTE, RN,** in her | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **CHERI HUTCHISON, LPN,** in her | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **GARY RISNER,** in his | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **CHEYENNE BAHR,** in her | ) | |
| individual and official capacities, | ) | |
| | ) | |
| **JENNIFER ROACH-SANSONE, QMHP,** in her | ) | |
| individual and official capacities, | ) | |

|  |  |
|---|---|
| **DEANNA BAJALA, M.D.,** in her individual and official capacities, | ) ) ) |
| **and,** | ) ) |
| **SHANNON TOOLE, NP,** in her individual and official capacities | ) ) ) ) |
| **Defendants.** | ) ) |

## FIRST AMENDED COMPLAINT FOR DAMAGES

**COMES NOW**, Plaintiff, Holden Graves, individually and by and through his undersigned counsel, and for his cause of action against Defendants, states and alleges the following upon information and belief:

## PRELIMINARY STATEMENT

1.    Plaintiff Holden Graves endured extreme neglect under the custody of the Missouri Department of Corrections, resulting in paralysis and inability to move, feed, hydrate, or care for himself. For *seven days*, while incarcerated at the Eastern Reception, Diagnostic and Correctional Center in Bonne Terre, Missouri, Holden was left paralyzed in his cell, forced to lie in his own waste, despite his repeated pleas for help. When finally taken to Mercy Hospital South, he was diagnosed with unstageable pressure ulcers on his knees and left hip, ulcerations on his scrotum and penis, rhabdomyolysis, acute kidney injury from sepsis, and a central cord injury secondary to a C1 fracture. Holden's suffering, both physical and mental, was immense and prolonged, made worse by the deliberate indifference of those responsible for his care. His basic human needs were cruelly denied, resulting in catastrophic and irreversible harm.

2.    Defendants failed Plaintiff in every conceivable way. They neglected to monitor him as required, ignored established policies, inadequately trained their staff, and utterly failed to

2

provide the critical care Plaintiff so desperately needed. Despite unmistakable signs of a medical emergency, Defendants chose inaction. Their gross neglect – failing to maintain humane living conditions and provide timely, adequate medical care – allowed Plaintiff's condition to deteriorate progressively, leaving him paralyzed, malnourished, and suffering from open and septic decubitus wounds. There was no oversight; Defendants knew or should have known their disregard for Plaintiff's wellbeing would result in profound harm, yet they deliberately chose to turn a blind eye, abandoning Plaintiff to suffer in his own waste.

3.    Plaintiff brings this action under federal law for negligence, negligent supervision, negligent training, negligent retention, medical negligence, and breach of ministerial duties. Additionally, Plaintiff asserts claims under the Eighth and Fourteenth Amendments to the United States Constitution, seeking redress for the inhumane treatment endured while in Defendants' custody. These constitutional violations, actionable under 42 U.S.C. § 1983, underscore Defendants' deliberate indifference to Plaintiff's rights and wellbeing, as they willfully failed to provide the care and protection mandated by law.

## JURISDICTION AND VENUE

4.    Venue is proper in the United States District Court for the Eastern District of Missouri, Eastern Division, pursuant to 28 U.S.C. § 1391(b), as the events giving rise to Plaintiff's claims occurred in St. Francois County, Missouri.

5.    Jurisdiction is proper under 28 U.S.C. § 1331, as Plaintiff asserts claims arising under federal law. Additionally, the Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same nucleus of operative facts.

6.    This Court has subject-matter jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983, and Article 5, section 14 of the Missouri Constitution. State courts have concurrent

jurisdiction over claims arising under 42 U.S.C. § 1983. *Haywood v. Drown*, 556 U.S. 729, 734-35 (2009).

7.      Plaintiff, as an individual, is entitled to bring this action under 42 U.S.C. § 1983, as his constitutional rights were violated under color of State law. This lawsuit seeks to address and remedy the deprivation of rights guaranteed by the United States Constitution.

<u>**PARTIES**</u>

8.      Plaintiff Holden Graves is currently incarcerated at the Farmington Correctional Center ("FCC") in St. Francois County, Missouri. At the time of the events relevant to this action, Plaintiff was housed at the Eastern Reception, Diagnostic and Correctional Center ("ERDCC") in Bonne Terre, Missouri, which is operated by the Missouri Department of Corrections.

9.      Defendant Missouri Department of Corrections ("MDOC") is a Missouri public entity established and governed by the laws of the State of Missouri and is subject to suit under RSMo § 217.020. MDOC exclusively manages, staffs, and operates the ERDCC in St. Francois County, Missouri, and has a legal duty to maintain the correctional facilities under its control, including the ERDCC. Defendant MDOC may be served through Trevor Foley, Acting Director of the Department of Corrections, at 2729 Plaza Drive, Jefferson City, Missouri 65102.

10.     Defendant Centurion of Missouri, LLC ("Centurion") is a licensed healthcare provider in the State of Missouri, engaged in providing healthcare services in exchange for compensation. Centurion is a limited liability company organized under Missouri law, with its principal place of business in the state. Under contract, Centurion provides healthcare services at all MDOC facilities, including the ERDCC. Centurion may be served through its registered agent, C T Corporation System, at 120 South Central Ave, Clayton, Missouri 63105.

11.    Defendant Richard Adams ("Defendant Warden") was the warden of ERDCC in Bonne Terre, Missouri, during the events described herein. Employed by MDOC, Defendant Warden is sued in both his individual and official capacities. He may be served at 2727 Hwy K, Bonne Terre, Missouri 63628.

12.    Defendants Sgt. Conner Province, C.O. Cole Wich, and Sgt. Rachel (hereinafter referred to as collectively "Defendant Officers") are correctional officers who were at all times herein mentioned, individuals and citizens of the State of Missouri. At all times referred herein, Defendant Officers were employees and correctional officers of the Missouri Department of Corrections, and at all times herein mentioned were acting as employees with the Missouri Department of Corrections at the ERDCC, cared for, observed, and were otherwise responsible for Plaintiff while he was an inmate ERDCC. Defendant Officers are sued in their individual and official capacities. Defendant Officers may be served through defense counsel, Assistant Attorney General Adam Merello, 615 East 13th Street, Suite 401, Kansas City, Missouri 64106.

13.    Defendants Chasity Grayson, LPN, Layota Merritte, RN, Cheri Hutchison, LPN, Gary Risner, Cheyenne Bahr, Jennifer Roach-Sansone, QMHP, Deanna Bajala, M.D., and Shannon Toole, NP (hereinafter referred to as collectively "Defendant Medical Professionals") are medical professionals who were at all times herein mentioned, individuals and citizens of the State of Missouri. At all times referred to herein, Defendant Medical Professionals were employees and agents of Centurion Health and the Missouri Department of Corrections. Defendant Medical Professionals are sued in their individual and official capacities. Defendant Medical Professionals may be served through defense counsel, Kevin K. Peek, at Sandberg Phoenix & Von Gontard P.C., 701 Market Street, Suite 600, St. Louis, Missouri 63101.

## **FACTUAL ALLEGATIONS AS TO ALL COUNTS**

5

14.     On or about November 30, 2021, Plaintiff was admitted to the Missouri Division of Adult Institutions ("DAI") to serve a fifteen-year sentence.

15.     Upon admission, Plaintiff was housed at the Fulton Reception and Diagnostic Center ("FRDC") in Fulton, Missouri.

16.     On or about December 5, 2023, Plaintiff was transferred to the ERDCC in Bonne Terre, Missouri.

17.     At all times relevant, Plaintiff was under the direct care, custody, and supervision of ERDCC and its staff, who were entrusted with the duty to ensure Plaintiff's safety, well-being, and access to adequate, necessary medical care.

18.     On or about March 11, 2024, at approximately 10:30 p.m., Plaintiff began suffering from severe and uncontrollable hallucinations, a clear sign of an urgent medical crisis. Despite their legal duty to monitor and respond to serious medical needs, Defendants stood by, indifferent, as Plaintiff's condition worsened.

19.     As Plaintiff's hallucinations worsened, he was overwhelmed by terrifying auditory commands urging him to jump from the balcony within the facility.

20.     Plaintiff succumbed to the relentless voices and leaped from a height of approximately fifteen (15) feet, crashing headfirst onto the concrete floor below.

21.     Even after a catastrophic fall – an event that would prompt immediate action in any setting – Defendants again failed to act.

22.     It was not until March 12, 2024, at approximately 6:22 a.m., eight hours after Plaintiff's plunge, that two separate Code 16 medical emergencies were finally called: one for a head injury, and another for the fall itself.

23.     By this time, Plaintiff had lain for hours on the floor, completely disoriented to person, place, time, and situation. Dried blood was crusted in and around his nose, and swelling was observed between his eyes and forehead.

24.     When custody staff eventually attempted to lift him, Plaintiff could not maintain his balance sitting or standing.

25.     Plaintiff was transported on a stretcher to the medical unit, where he remained incoherent, unresponsive to basic questions, and visibly in need of urgent care.

26.     It was only after belated acknowledgment of the severity of his condition that Plaintiff was transferred by ambulance to Mercy Hospital Jefferson for further medical evaluation and treatment.

27.     Upon Plaintiff's return to ERDCC from Mercy Hospital Jefferson, where he had received treatment for his injuries, he was briefly brought to the Treatment Care Unit ("TCU").

28.     Despite the severity of Plaintiff's injuries and his repeated pleas, informing Defendants that he could not walk, Defendants failed to keep Plaintiff in the TCU for necessary evaluation or ongoing care. Instead, they ignored Plaintiff's clear need for continued medical supervision.

29.     In desperation, Plaintiff requested to remain in the TCU to receive proper care. However, Defendants informed him that no beds were available, leaving Plaintiff without the critical medical attention he needed, a decision made despite the two prior Code 16 emergencies – one for his head injury and another for his fall.

30.     In a further act of disregard for Plaintiff's serious medical needs, Defendants inaccurately documented Plaintiff's treatment at Mercy Hospital Jefferson, dismissively recording

that he was seen merely for "fainting," a gross understatement that downplayed the serious injuries Plaintiff had sustained.

31.    Rather than responding with the medical care Plaintiff urgently required, Defendants decided to confine Plaintiff to Housing Unit 2 of the Administrative Segregation ("Ad Seg") Unit on suicide watch. This designation was intended for close observation and protection, yet it was no substitute for the critical medical intervention Plaintiff desperately needed.

32.    On March 12, 2024, immediately after Plaintiff's return to ERDCC from Mercy Hospital Jefferson, Plaintiff's worsening condition led to two more Code 16 emergencies being called – further highlighting the serious, ongoing medical crisis Defendants failed to address:

　　　　a.    The first Code 16 occurred at approximately 6:41 p.m., when Plaintiff, visibly distressed and weakened from being confined in the suicide cell, again begged for placement in the TCU. Plaintiff expressed his mounting frustration, reporting that his condition was deteriorating, he was growing weaker, and he was not receiving any medical care; and

　　　　b.    Just one hour and twenty-three minutes later, the second Code 16 was called when Plaintiff was discovered lying on the cold concrete floor of his cell, covered in his own diarrhea. In a state of helplessness, Plaintiff cried out that he was unable to control his bowel movements, could not walk to the bathroom, and urgently needed placement in the TCU. Plaintiff remained ignored by Defendants.

33.    Defendant Medical Professionals, in a shocking display of disregard for their duty to Plaintiff, refused to take Plaintiff's vital signs, citing the fact that he was "covered in stool" as justification for their inaction.

34.    Defendant Medical Professionals' refusal to provide even the most fundamental medical assessment, when Plaintiff was clearly in distress, indicates an alarming indifference to Defendants' treatment of Plaintiff's condition.

35.    When Plaintiff was finally placed in a wheelchair and taken to the shower, his suffering continued unabated. Defendant Officers refused to press the shower button. When Plaintiff explained that his arms were too weak to raise, Defendant Officers coldly ignored his pleas for help. Instead of assisting Plaintiff, Defendant Officers brought him back to his cell, leaving him a mess in his feces.

36.    Plaintiff lay on the cold concrete floor of his cell for three agonizing days, unable to stand or even crawl to the bathroom. He was too weak to accept his meals or even drink water. It wasn't until this third day, March 15, 2024, that yet another Code 16 emergency was finally called.

37.    This Code 16 was called after Plaintiff, in a desperate attempt to move himself, hit his head. Despite the seriousness of the situation, Defendant Medical Professionals conducted only a brief visual and physical examination, dismissively noting "no injuries" and offering a follow-up plan to have Plaintiff shower, as he was *still* covered in feces and urine.

38.    However, Plaintiff was physically incapable of showering without assistance, and instead of providing the help he so clearly needed, Defendant Officers refused. Defendant Officers callously assumed Plaintiff was lying about his condition, compounding his suffering.

39.    On March 16, 2024, the fourth day of lying on the filthy floor of his cell, still covered in dried feces and urine, without having eaten or had a drink, another Code 16 emergency was called. Plaintiff was presumed unresponsive.

9

40.     However, when Defendant Medical Professionals and Officers entered Plaintiff's cell, they found him alert, pleading once again to be placed in the TCU and removed from segregation. Plaintiff's repeated demands still went ignored.

41.     On March 17, 2024 – after *five* days of lying in his filth – yet another Code 16 medical emergency was called. Plaintiff once again told Defendants that he needed to be in the TCU, not confined to a suicide cell. He repeated, with growing desperation, that he was unable to move to use the bathroom and that his arms were so weak he couldn't even lift them to eat or drink water.

42.     Upon examination, Defendant Medical Professionals noted that Plaintiff now had abrasions on both knees, clear evidence to even a layperson of Plaintiff's worsening condition.

43.     Yet, despite these visible injuries, they failed to transfer him to the medical unit for further treatment. Instead, Defendants reiterated the same excuse – that there were no available beds for Plaintiff in the TCU.

44.     By March 18, 2024, after *six* days of lying in filth, unable to move, another Code 16 was called. Plaintiff had now been deprived of food and water for six days, and his condition was worsening.

45.     Plaintiff was desperate and weak, seeking medical attention in any way he could, but his pleas for assistance were met with continued indifference.

46.     By March 19, 2024, Plaintiff had endured an *entire week* of lying in his own filth without any assistance for eating, drinking, or showering. Seven days passed without meaningful medical care or intervention.

47.     On March 20, 2024, Plaintiff's wounds, which had been noted just three days earlier, had progressed to large areas of necrosis, and skin was sloughing off his left hip. In desperation, Plaintiff reiterated that he could not sit, walk, or even move his hands.

48.     Defendants noted that Plaintiff was covered in "crusted blood and feces over most body surfaces." After eight long days of neglect, Plaintiff was finally aided with a shower, a basic act of care that should have been administered much earlier.

49.     It wasn't until this day – after enduring *eight* grueling days of neglect – that Plaintiff was finally transported to the Emergency Department at Mercy Hospital Jefferson.

50.     Plaintiff, paralyzed in his hospital bed, finally believing he was getting the medical attention he desperately needed, told Dr. Evens in the Emergency Department that for days he endured his wounds and paralysis without any word from Defendants, without a single indication that help was coming, or that his pain and suffering were acknowledged.

51.     Defendant Officer Doe shockingly admitted that Plaintiff had fallen approximately fifteen (15) feet onto concrete after experiencing auditory hallucinations. Defendant Officer Doe acknowledged that Plaintiff was marked as a suicide risk yet after this traumatic fall, Plaintiff received no immediate medical intervention – no examination, no treatment, nothing to address the serious injuries that resulted from a fall at that height.

52.     With a medical professional finally listening to him, Plaintiff described the excruciating conditions he had endured. He told the doctor that paralyzed and helpless, he had been forced to lay in his urine and feces for a prolonged period, as he was unable to get himself up to move or use the bathroom. Necessities – food, water, even the dignity of cleanliness – were beyond his reach due to his immobility.

53.     Dr. Evens reviewed Plaintiff's systems and found the following:

a. Constitutional (overall health status and function across different body systems): positive for activity change and fatigue;

b. Musculoskeletal: positive for arthralgias (pain or discomfort in the joints), back pain, myalgias (muscle pain or discomfort), and neck pain;

c. Skin: positive for color change and wound; and

d. Neurological: positive for weakness.

54. Unlike Defendant Medical Professionals who noted "no neurological deficits," Dr. Evens noticed Plaintiff's weakness. It was obvious at this point that Plaintiff was not lying or exaggerating his condition as Defendants believed.

55. Upon Dr. Even's physical examination of Plaintiff, he found the following:

a. Constitutional: dry mucous membranes;

b. Abdominal: diffuse tenderness;

c. Musculoskeletal: tenderness throughout thoracic back;

d. Skin: multiple wounds to the left lower back and buttocks area, right arm, and both legs. All wounds appear to be pressure sores in various stages, with some of the skin being black and appearing devitalized. Some areas are blistered and peeling; and

e.    Neurological: weakness to both arms, especially extension of both arms and wrists, and weakness of both legs.

   

56.    Dr. Evens ordered a series of CT scans to investigate the underlying cause of Plaintiff's deteriorating condition.

57.    CT scans revealed an oblique lucency across the posterior aspect of Plaintiff's C1 lateral mass, indicating a nondisplaced fracture of undetermined age. Additional imaging identified central canal stenosis at the C3-C4 level, correlating with Plaintiff's severe neurological symptoms.

58.    Further CT scans showed marked bladder distention, accompanied by secondary dilatation of the ureters and renal collecting systems, indicating acute kidney injury (AKI).

59.    Lab results revealed that Plaintiff was suffering from severe dehydration and rhabdomyolysis – a dangerous breakdown of muscle tissue that can lead to acute kidney damage.

60.    Given the severity of Plaintiff's condition, he was transferred to Mercy Hospital South Orthopedics in St. Louis, Missouri, for specialized treatment.

61.    Upon arrival, Plaintiff's medical team developed a plan to rehydrate him and perform an MRI of his spine. Doctors also noted that they "suspect [the wounds] will heal on their

own now that he can get runs and is not being neglected," a stark and undeniable acknowledgment of Defendants' failure to provide the necessary care and attention Plaintiff desperately required.

62.    An additional CT scan conducted by Mercy Hospital South Orthopedics revealed significant cervical spondylosis at the C3-C4 level. The subsequent MRI confirmed severe central canal stenosis and cord signal changes at C3-C4.

63.    Plaintiff's medical conditions upon admission reflected the profound extent of his suffering and the consequences of prolonged neglect. He was diagnosed with a closed, nondisplaced fracture of the first cervical vertebra, alongside cervical spinal stenosis, a condition that compressed the spinal canal and caused severe neurological impairments.

64.    In addition, he suffered from AKI and extreme dehydration due to neglect of his basic needs. Traumatic rhabdomyolysis, a life-threatening breakdown of muscle tissue, further compromised Plaintiff's health, while pressure ulcers on his knees, some unstageable at this point, evidenced the failure of Defendants to provide even minimal care. Plaintiff also displayed cervical spondylosis and spinal cord injury from C1-C4. Plaintiff was also found to be severely malnourished, having lost 8.4% of his body weight in the *seven* days he was unable to feed himself.

65.    On or about March 22, 2024, Dr. Alex Michael performed a series of critical procedures to address the catastrophic spinal damage that was made worse by Defendants' deliberate indifference to Plaintiff's serious medical needs. These procedures included:

       a.    A C3-C4 anterior interbody arthrodesis, requiring extensive removal of damaged discs, decompression of the spinal cord, and removal of bone spurs pressing on the nerves.

       b.    To stabilize the spine, a titanium plate was inserted at the C3 and C4 vertebrae, along with a biomechanical device to provide the necessary support for the area.

     c.     Both allograft and local autograft materials were used to promote healing and ensure the integrity of the spinal reconstruction.

66.     Following these life-altering procedures, Plaintiff remained in the care of staff at Mercy Hospital South to receive the ongoing, critical care that Defendants failed to provide at ERDCC. This delay in medical attention directly contributed to Plaintiff's worsening condition and prolonged suffering.

67.     Upon his admission into Mercy Hospital South, Plaintiff was diagnosed with unstageable decubitus ulcers on both knees and the left anterior superior iliac spine, as well as healing wounds on both of his elbows, right wrist, and left hip.

68.     On or about March 28, 2024, in response to Plaintiff's excruciating and severe wounds, Dr. Jennifer LaPlante performed a series of critical procedures to address the damage caused by prolonged neglect.

69.     Plaintiff underwent sharp debridement of both knees and the left anterior iliac spine, as well as Versajet debridement to treat the wounds on his knees. To further aid the healing process, a wound vacuum was applied to both knees.

70.     During the procedure, Dr. LaPlante discovered that the decubitus ulcers on Plaintiff's knees and left anterior superior iliac spine had progressed to stage IV – the most severe form of pressure ulcer, characterized by full-thickness tissue loss and exposed bone, tendon, or muscle. These wounds were devasting, and their severity underscored the gross neglect of Defendants while Plaintiff was in custody at ERDCC. The specifics of the wounds were as follows:

     a.     Right knee: 11 cm by 9 cm by 2 cm, with a 5 cm tunnel extending deeply into the tissue beneath the knee

b.    Left knee: 10 cm by 11 cm by 2 cm, with additional smaller areas of 5 cm by 3 cm by 0.5 cm, and 4 cm by 3.5 cm by 1 cm; and

c.    Left anterior superior iliac spine: 4 cm by 3 cm by 0.5 cm.


*Bilateral knees*


*Left anterior superior iliac spine*

71.    Plaintiff remained in the care of Mercy Hospital South until April 5, 2024. Plaintiff's state reflected clear signs of adult abuse and neglect, as he was left to endure debilitating injuries and critical conditions without Defendants intervening for time or adequate medical intervention. The abuse and neglect Plaintiff suffered were formally documented and reported by medical professionals.

72.    Plaintiff's condition was a direct result of prolonged immobility, lack of medical care, and delayed intervention by Defendants.

73.    All of Plaintiff's severe medical needs, including spinal cord injuries, pressure ulcers, malnutrition, and kidney injury, arose due to Defendants' deliberate indifference, inadequate care, and the unconstitutional conditions in which Plaintiff was confined. The failure to provide timely medical attention and to prevent further harm amounted to violations of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

74.     On or about December 5, 2023, Plaintiff was transferred to the custody of the FCC, located at 1012 West Columbia Street, Farmington, Missouri 63640.

75.     Once Plaintiff transferred, he filed an Informal Resolution Request (IRR) to begin the grievance process.

76.     Plaintiff has yet to receive an update about his grievance, only that his case is being investigated.

77.     An investigator met with Plaintiff and notified him that at least seven (7) staff members were fired as a result of his care and condition.

78.     At all times relevant, Defendants were fulfilling their employment for the State of Missouri within the Missouri Department of Corrections.

79.     At all times relevant, Defendants had a system of policies and rules that were intended to check and assist inmates in significant medical needs to ensure that no inmate would be subject to inhumane conditions.

80.     At all times relevant, Defendants were required to follow that system of policies, customs, and/or action in providing oversight and protection, intended to ensure no inmates were left unsupervised for enough time to suffer severe physical and psychological pain of untreated serious medical needs, yet Defendants were deliberately indifferent to official policy, custom, and/or action by failing to respond to Plaintiff's repeated attempts to seek medical attention for his serious medical needs.

81.     As a direct and proximate result of the negligence and deliberate indifference of Defendants, in their failure to perform ministerial duties, Plaintiff was caused to suffer severe and painful injuries.

82.     As a direct and proximate result of Defendants' negligent and deliberate failure to comport with their legal duty to maintain their facilities in a way free from cruel and unusual punishment, Plaintiff was caused to suffer severe and painful injuries.

**COUNT I**
**Medical Negligence**
**(Against Defendant Centurion)**

83.     During his incarceration at ERDCC, Plaintiff was under the care, custody, and control of Defendant Centurion.

84.     Defendant Centurion had a duty to provide adequate medical care to inmates and patients at ERDCC, including Plaintiff.

85.     Defendant Centurion breached this duty, acting negligently and carelessly in the following ways:

   a.     Failing to adequately assess, evaluate, and manage Plaintiff's injuries and condition despite repeated signs of distress, such as visible worsening of his immobility and physical discomfort;

   b.     Failing to diagnose and treat Plaintiff's progressive paralysis, resulting in Plaintiff losing motor function and the ability to move or care for himself;

   c.     Failing to monitor Plaintiff's condition for signs of infection, malnutrition, dehydration, and decubitus wounds, despite Plaintiff's lack of mobility and obvious risk factors to even a layperson for such complications;

   d.     Failing to assist Plaintiff in basic hygiene tasks, including using the bathroom and bathing, leading him to lie immobilized in his own urine and feces for an extended period, which directly contributed to the development of severe skin ulcers and infections;

18

e.    Neglecting to reposition Plaintiff at appropriate intervals, as he was denied a bed in the TCU in favor of the concrete floor of his cell, allowing extensive decubitus ulcers to develop on his body, which became necrotic due to exposure to urine and feces, lack of cleaning, and lack of treatment;

f.    Failing to assist Plaintiff with eating and drinking, despite his inability to do so independently, which led to dangerous levels of malnutrition and dehydration, evidenced by significant weight loss, muscle wasting, and an AKI caused by inadequate fluid intake;

g.    Failing to establish and implement policies or protocols to ensure inmates like Plaintiff receive comprehensive assessments, timely evaluations, and necessary medical interventions to prevent deterioration of their conditions; and

h.    Allowing Plaintiff's condition to progress to paraplegia by failing to address repeated signs of his worsening condition, including loss of limb function and symptoms of pain and distress, resulting in severe and permanent physical injuries.

86.    As a direct and proximate result of Defendant Centurion's negligence and breach of duty as described herein, Plaintiff suffered severe and permanent injuries, enduring immense pain and suffering during his stay at ERDCC.

87.    Defendant's conduct, as described in the preceding Paragraphs, constitutes aggravating circumstances under Missouri law. This conduct was carried out with the knowledge that it created a high probability of injury to Plaintiff and others similarly situated, demonstrating deliberate indifference and a conscious disregard for the life and safety of others. Public policy demands that such conduct be punished through the imposition of aggravating circumstances.

88.    The actions described above show that Defendant Centurion acted without just cause or with a deliberate and flagrant disregard for the rights of others, including Plaintiff.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, prays for judgment against Defendant Centurion in such amounts as are fair and reasonable to compensate Plaintiff for his damages incurred, for his costs herein incurred, and for such other relief as the Court deems just and proper under the circumstances.

**COUNT II**
**<u>Negligence</u>**
**(Against All Defendants)**

89.    Plaintiff re-alleges and incorporates each and every allegation set forth in Paragraphs 1 through 88 by reference as if fully set forth in this Count II verbatim.

90.    Defendants owed Plaintiff a duty of care, which included reasonably supervising, directing, and overseeing Plaintiff's housing and promptly approving or facilitating medical care, as well as ensuring adherence to the recommendations and orders issued by Plaintiff's healthcare providers.

91.    Defendant MDOC established mandatory policies and procedures at ERDCC that require employees, correctional officers, and staff to act in a prescribed and non-discretionary manner, designed to protect the health and well-being of inmates, including Plaintiff.

92.    Defendant MDOC's mandatory policies and procedures at ERDCC include, at a minimum:

a.    That correctional officers and employees properly assess, evaluate, and manage inmates with physical conditions, ensuring that signs of medical distress or disability are promptly addressed;

b.      That inmates be monitored at least every thirty (30) minutes, with any irregularities in their condition or behavior promptly documented and communicated to medical personnel;

c.      That inmates in Ad Seg be under continuous observation to ensure their safety and well-being;

d.      That any inmate requesting or visibly requiring medical attention receive it immediately to prevent further injury or deterioration of health;

e.      That all staff in the unit shall maintain a daily Chronological Log noting all events and observations, including any signs of physical distress or need for medical intervention;

f.      That the chief of custody shall tour the unit daily, exercising close supervision and control to protect the rights, safety, and welfare of all inmates, including Plaintiff;

g.      That all Code 16 medical emergencies for inmates in Ad Seg are to be immediately announced over the radio with specific housing unit, wing, and cell information to ensure rapid response; and

h.      That all correctional staff must follow Post Orders #20, #081, #082, and #082A, specifically addressing the safety, monitoring, and care of inmates in Ad Seg, including addressing medical emergencies.

93.     Defendant were negligent and derelict in performing their mandatory, ministerial duties in the following ways:

a.      Acting individually and in concert, Defendants exacerbated Plaintiff's medical condition by failing to provide or approve adequate medical treatment, and in

certain instances, by denying treatment altogether during his incarceration at ERDCC, despite his evident need;

b.    Failing to properly monitor Plaintiff while he was confined in Ad Seg at ERDCC, neglecting mandatory observation schedules, which left him without care during critical periods of distress;

c.    Allowing Plaintiff to remain immobilized in his own urine and feces on the concrete floor of his cell for *seven* days, resulting in the development of severe and necrotic pressure ulcers, sloughing skin, muscle waste, acute dehydration, and malnutrition, all of which were preventable with minimal intervention;

d.    Failing to recognize and act upon Plaintiff's worsening condition, which directly and proximately caused Plaintiff's paralysis and a series of severe, life-altering injuries that would have been mitigated or prevented entirely with basic adherence to required duties.

94.    Official immunity does not operate to shield public officers from civil liability for injuries arising out of their negligent performance of merely ministerial acts and functions in the exercise of their official duties. *Harris v. Munoz*, 43 S.W.3d 384, 387 (Mo. App. W.D. 2001).

95.    Official immunity protects public officials for negligence that is strictly related to the performance of discretionary duties, not to the performances of clerical, routine, or mundane duties. *Green v. Lebanon R-III Sch. Dist.*, 13 S.W.3d 278, 284 (Mo. banc 2000).

96.    As a direct and proximate result of Defendants' negligence and breach of their ministerial duties, Plaintiff suffered severe and permanent injuries, including paralysis, along with immense pain, humiliation, and physical suffering during his time at ERDCC.

97.     The actions described above demonstrate that Defendants acted without just cause, or with a deliberate and flagrant disregard for the rights, health, and safety of Plaintiff. Their conduct reflects an indifference to the welfare of inmates under their care, evidencing a willful neglect of their duties.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, prays for judgment against Defendants, jointly and severally, in such amounts as are fair and reasonable to compensate Plaintiff for his damages incurred, for his costs herein incurred, and for such other relief as the Court deems just and proper under the circumstances.

### COUNT III
### Respondeat Superior
### (Against Defendant MDOC)

98.     Plaintiff re-alleges and incorporates each and every allegation set forth in Paragraphs 1 through 97 by reference as if fully set forth in this Count III verbatim.

99.     In committing the acts alleged herein, the individually named Defendants were acting as agents of Defendant MDOC and were, at all relevant times, acting within the scope of their employment.

100.    Defendant MDOC holds an insurance policy that covers the actions of the individually named Defendants as described herein, thereby waiving sovereign immunity in this matter.

101.    As the principal, Defendant MDOC is liable for all torts committed by its agents.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, prays for judgment against Defendant Centurion in such amounts as are fair and reasonable to compensate Plaintiff for his damages incurred, for his costs herein incurred, and for such other relief as the Court deems just and proper under the circumstances.

### COUNT IV

**Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 (Failure to Provide Adequate
and Necessary Medical Care)**
**(Against All Defendants)**

102.    Plaintiff re-alleges and incorporates each and every allegation set forth in
Paragraphs 1 through 101 by reference as if fully set forth in this Count IV verbatim.

103.    Plaintiff's medical needs were so obvious and urgent that any reasonable person,
including those without medical training, would have recognized the necessity for immediate
medical intervention.

104.    Plaintiff's serious medical needs were apparent through his immobility, his visible
suffering from severe, untreated pressure wounds (decubitus ulcers), and his confinement in a cell
contaminated with dried urine and feces, compounded by his inability to eat, shower, or use the
bathroom independently.

105.    Plaintiff showed unmistakable signs of serious medical distress, including repeated
requests for assistance and multiple calls of Code 16 medical emergency – signaling the critical
nature of his condition.

106.    Despite these obvious and urgent signs, Defendants failed to provide Plaintiff with
even basic supervision and assistance, acting deliberately indifferent to his repeated requests for
help with essential activities such as eating, drinking, showering, and using the bathroom.

107.    Defendants unjustifiably dismissed Plaintiff's visible suffering and critical
condition, continually assuming or suggesting that he was feigning his symptoms despite clear
evidence to the contrary.

108.    Defendants knew or reasonably should have known, of a pattern and practice at
ERDCC of willfully disregarding the medical needs of inmates, including the widespread failure
to provide necessary care even when mandated by established medical standards and correctional
policies.

109.    Defendants failed to adequately supervise and oversee their agents, servants, and employees, thereby permitting them to act in ways that violated Plaintiff's clearly established constitutional rights.

110.    Defendants knew or should have known, that Plaintiff's condition posed a substantial and immediate risk to his health, as evidenced by his severe and obvious physical impairments and distress, which called for urgent medical intervention.

111.    As state correctional facility officials, Defendants were obligated under the Eighth Amendment to refrain from inflicting cruel and unusual punishment upon inmates, including Plaintiff, by ensuring access to adequate and necessary medical care.

112.    A "serious medical need" is defined as "one that has been diagnosed by a physician as requiring treatment, or *one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention*." *Coleman v. Rahija*, 114 F.3d 1234, 1239 (8th Cir. 1997).

113.    Defendants breached their duties by acting, or by allowing ERDCC management and employees to act, with deliberate indifference and reckless disregard for the substantial risks to Plaintiff's health and safety, leading to prolonged suffering and significant injury:

    a.    Failing to provide adequate and appropriate medical treatment for Plaintiff's documented, serious medical needs;

    b.    Ignoring Plaintiff's repeated complaints about deteriorating motor function and urgent requests for medical assistance;

    c.    Neglecting to assist Plaintiff with showering, despite his obvious need;

    d.    Failing to assist Plaintiff with eating, leading to further malnutrition and physical decline;

    e.    Failing to assist Plaintiff with drinking, leading to muscle waste and AKI;

25

  f. Allowing Plaintiff to remain in a cell contaminated with urine and feces, resulting in painful and severe pressure ulcers and skin infections;

  g. Failing to properly monitor Plaintiff's condition, especially given his Ad Seg confinement and evident physical impairments;

  h. Disregarding established medical administration procedures required for inmates with significant medical needs;

  i. Violating mandatory ministerial Ad Seg protocols that dictate consistent monitoring and welfare checks;

  j. Omitting regular checks on Plaintiff's condition while he was confined in Ad Seg, despite clear indicators of his deteriorating health;

  k. Failing to ensure Plaintiff's physical safety and welfare during his incarceration;

  l. Recognizing, yet deliberately ignoring, the worsening of Plaintiff's condition – including his loss of motor function, severe pressure wounds, inability to self-care, and escalating distress – thereby allowing him to deteriorate further; and

  m. Allowing Plaintiff's physical health to degrade to the point of drastic weight loss, profound suffering, and irreversible harm.

114. Through these actions and inactions, Defendants, acting under color of State law, demonstrated deliberate indifference to Plaintiff's serious medical needs and the substantial risk of significant injury. Despite clear awareness of his suffering, Defendants chose to withhold necessary care, depriving Plaintiff of his constitutionally protected rights.

115. Defendants intentionally ignored or recklessly disregarded clear, documented facts regarding Plaintiff's serious medical needs and the substantial risks of inaction. Defendants either

failed to properly train, supervise, or discipline their agents, servants, and employees or knowingly permitted practices that directly violated Plaintiff's constitutional rights.

116.    The actions of Defendants, described herein, constitute aggravating circumstances under Missouri law. Defendants acted with knowledge that their behavior created a high likelihood of injury to Plaintiff or similarly situated individuals, evidencing such flagrant disregard for human life and safety that public policy mandates punitive measures.

117.    Defendants' conduct, as outlined above, reflects a complete disregard for Plaintiff's rights and well-being, undertaken without any just cause or rational justification.

118.    As a direct and proximate result of Defendants' violation of Plaintiff's constitutional rights, Plaintiff suffered immense physical pain, mental anguish, and suffering, all of which persisted up to the time of his eventual hospitalization on March 20, 2024.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, prays for judgment against Defendants, jointly and severally, in such amounts as are fair and reasonable to compensate Plaintiff for his damages incurred, for his costs herein incurred, and for such other relief as the Court deems just and proper under the circumstances.

## COUNT V
### Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 (Failure to Implement Appropriate Policies and Failure to Retain, Train, and Supervise)
### (Against Defendants MDOC and Centurion)

119.    Plaintiff re-alleges and incorporates each and every allegation set forth in Paragraphs 1 through 118 by reference as if fully set forth in this Count V verbatim.

120.    From on or about March 11, 2024, Plaintiff exhibited clear signs of needing urgent medical attention, repeatedly informing correctional officers and medical staff of his inability to stand, walk, or care for himself independently.

27

121.    Given Plaintiff's visible serious medical needs, a reasonable person in Defendants' position would have recognized that withholding timely medical care and supervision posed a significant risk of harm and constituted a violation of Plaintiff's constitutional rights.

122.    Defendants' policy, customs, and practice resulted in the violation of Plaintiff's constitutional right to be free from cruel and unusual punishment under the Eighth Amendment by perpetuating a culture of deliberate indifference to inmates' serious medical needs.

123.    Defendants' consistent practice of ignoring clear signs of severe medical conditions and failing to provide prompt medical attention deprived Plaintiff of his rights under the Eighth Amendment to the United States Constitution.

124.    Alternatively, Defendants' failure to establish and enforce adequate policies, customs, and practices led directly to the violation of Plaintiff's constitutional right to be free from cruel and unusual punishment under the Eighth Amendment.

125.    Defendants created, enforced, and perpetuated policies, customs, and practices that displayed a deliberate indifference to the rights and safety of inmates, including Plaintiff.

126.    Alternatively, Defendants failed to implement policies, customs, and practices that would ensure Plaintiff's safety and medical care, specifically regarding timely and appropriate medical treatment for inmates with visible and serious medical needs.

127.    Defendants' failure to provide essential medical care and neglect of Plaintiff's safety while in Ad Seg, despite his clear and urgent needs, violated his constitutional right to be free from cruel and unusual punishment under the Eighth Amendment.

128.    Defendants demonstrated deliberate indifference to Plaintiff's serious medical needs by failing to adequately train, supervise, and retain staff regarding the rights and medical needs of inmates experiencing severe medical emergencies.

129.   Defendants' lack of appropriate training and supervision shows a deliberate disregard for the constitutional rights of inmates, including Plaintiff, leading to insufficient responses to his serious medical needs.

130.   During the period Plaintiff was in the care, custody, and control of Defendants at ERDCC, he was in critical need of medical care – a fact Defendants knew or should have known and yet failed to address adequately.

131.   Defendants' failure to implement and enforce policies to ensure access to qualified medical providers for Plaintiff amounts to deliberate indifference to his serious medical needs, in violation of his constitutional rights..

132.   Through their relationship with ERDCC, Defendants had a constitutional duty to provide Plaintiff with adequate healthcare, a fundamental responsibility under the Eighth Amendment.

133.   Defendants, as providers of healthcare to ERDCC inmates, knew or should have known about Plaintiff's serious medical needs through his repeated complaints and direct interactions with their medical staff.

134.   Defendants have a duty to avoid establishing policies or customs that deprive inmates of necessary medical treatment, especially when such policies foreseeably result in harm. *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993).

135.   Defendants' policies, customs, or actions denying Plaintiff necessary medical treatment caused him severe physical and mental suffering. Plaintiff endured debilitating ailments, lost nearly nine percent of his body weight, and was forced to lie in his excrement without assistance due to Defendants' failure to provide adequate care for his severe spinal injury.

136.    Plaintiff's serious medical need was evident through his inability to move independently, feed himself, or perform basic hygiene without assistance.

137.    Despite Plaintiff's obvious medical needs, Defendants denied him adequate medical care and failed to monitor his condition appropriately.

138.    Despite Plaintiff's explicit request to be placed in the TCU for additional assistance, Defendants failed to provide him with the necessary supervision or medical support.

139.    Defendants knew or should have known, the pattern of deliberately refusing or neglecting the medical needs of inmates, a practice contrary to basic medical standards and correctional policies.

140.    Defendants failed to adequately supervise their employees and agents, allowing them to act in ways that violated Plaintiff's constitutional rights.

141.    Defendants knew that there was a substantial risk to Plaintiff's health given his critical state and obvious need for medical attention.

142.    As state correctional facility officials and prison medical providers, Defendants had a duty to avoid inflicting cruel and unusual punishment on inmates, including Plaintiff, by ensuring access to adequate medical care.

143.    Defendants had a duty not to act with deliberate indifference to the serious medical needs of inmates under their care, as this constitutes a violation of the constitutional right of inmates to be free from cruel and unusual punishment under the Eighth Amendment.

144.    A "serious medical need" is defined as "one that has been diagnosed by a physician as requiring treatment, or *one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention*." *Coleman v. Rahija*, 114 F.3d 1234, 1239 (8th Cir. 1997).

145.    In committing the acts complained of herein, Defendants acted under color of State law, showing deliberate indifference to Plaintiff's serious medical needs and substantial risk of harm despite actual knowledge of his need for medical intervention, thereby violating Plaintiff's rights under the Eighth Amendment to the United States Constitution.

146.    Defendants' policies, customs, and practices encouraged their agents, servants, and employees to ignore inmates' medical needs, including Plaintiff's, thereby perpetuating deliberate indifference and denying necessary medical treatment.

147.    As designated policymaking bodies for ERDCC, Defendants are responsible for the conduct of all agents, servants, and employees under their control. Defendants had the power and responsibility to prevent practices that foster deliberate indifference yet failed to implement policies protecting inmates' constitutional rights.

148.    Defendants' failure to act in the face of constitutionally violative conduct led to the deprivation of Plaintiff's rights as alleged.

149.    As a direct and proximate result of Defendants' violation of Plaintiff's constitutional rights under the Eighth Amendment, Plaintiff suffered general and special damages, entitling him to relief under 42 U.S.C. § 1983.

150.    Defendants intentionally disregarded known facts, or, alternatively, acted with such deliberate indifference and negligence to the risks of constitutional violations that they failed to properly train, supervise, discipline, and instruct their agents, servants, and employees, foreseeably resulting in the deprivation of Plaintiff's rights.

151.    Defendants acted with deliberate indifference and conscious disregard for Plaintiff's rights, constituting aggravating circumstances under Missouri law. Their conduct

created a high probability of injury, justifying punitive measures to deter similar disregard for inmate welfare.

152.    The actions described above demonstrate Defendants acted without just cause and with a deliberate and flagrant disregard for Plaintiff's rights, warranting relief under federal law.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, prays for judgment against Defendants, jointly and severally, in such amounts as are fair and reasonable to compensate Plaintiff for his damages incurred, for his costs herein incurred, and for such other relief as the Court deems just and proper under the circumstances.

**COUNT VI**
**Violation of Civil Rights Pursuant to Title 42 U.S.C. § 1983 (Failure to Afford Humane Conditions of Confinement in Compliance with Eighth Amendment Right Against Cruel and Unusual Punishment)**
**(Against All Defendants)**

153.    Plaintiff re-alleges and incorporates each and every allegation set forth in Paragraphs 1 through 152 by reference as if fully set forth in this Count VI verbatim.

154.    The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment, which includes deliberate indifference to the serious medical needs and inhumane conditions of inmates.

155.    As state correctional facility officials and healthcare providers, Defendants had a duty to ensure that Plaintiff was not subjected to conditions that were cruel, inhumane, or otherwise violated Plaintiff's rights under the Eighth Amendment.

156.    Defendants violated Plaintiff's constitutional rights by failing to provide humane conditions of confinement while he was incarcerated at ERDCC. Defendants' failures included, but were not limited to, the following:

a.  Defendants failed to provide Plaintiff with adequate and timely medical care for his serious medical needs, including his spinal injury, resulting in the deterioration of his health and exacerbation of his condition;

b.  Defendants neglected Plaintiff's basic hygiene needs, denying him access to showers or assistance with cleaning himself, which left Plaintiff in prolonged contact with his own urine and feces;

c.  Defendants failed to ensure that Plaintiff, who was paralyzed and unable to feed or hydrate himself, had access to food and water, exposing him to severe risk of malnutrition and dehydration;

d.  Defendants allowed Plaintiff to remain in unsanitary and inhumane living conditions, exposing him to prolonged contact with bodily waste, which led to the development of decubitus ulcers and other serious infections; and

e.  Defendants failed to provide Plaintiff with a safe and sanitary environment, subjecting him to severe physical and psychological suffering over the course of seven days. Their neglect directly resulted in Plaintiff's paraplegia, dehydration, malnutrition, and the development of necrotic decubitus ulcers.

157.  Defendants' actions and omissions, as described herein, were undertaken with deliberate indifference to Plaintiff's basic human needs, health, and safety, violating his rights under the Eighth Amendment.

158.  Defendants knew or should have known about the substantial risk to Plaintiff's health and well-being due to the ongoing inhumane conditions and lack of medical care. Despite this knowledge, Defendants failed to take reasonable steps to mitigate or address these risks.

159.    Defendants' conduct constituted the unnecessary and wanton infliction of pain. Their deliberate indifference to Plaintiff's suffering resulted in serious harm, including paralysis, malnutrition, dehydration, severe physical pain, and extreme mental anguish.

160.    As a direct and proximate result of Defendants' violation of Plaintiff's constitutional rights, Plaintiff has suffered and continues to suffer significant physical, emotional, and psychological harm, for which Defendants are liable.

161.    The actions described above demonstrate that Defendants acted without just cause or with a deliberate and flagrant disregard for the rights of others, including Plaintiff.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, prays for judgment against Defendants, jointly and severally, in such amounts as are fair and reasonable to compensate Plaintiff for his damages incurred, for his costs herein incurred, and for such other relief as the Court deems just and proper under the circumstances.

## INJURIES AND DAMAGES

162.    Plaintiff re-alleges and incorporates each and every allegation set forth in Paragraphs 1 through 161 by reference as if fully set forth herein.

163.    As a direct and proximate result of the negligence outlined above, Plaintiff has suffered significant personal injuries, including excruciating pain, suffering, and mental anguish. Due to Defendants' deliberate indifference to Plaintiff's serious medical needs, Plaintiff has endured severe, permanent, and life-altering injuries. Specifically, Plaintiff's medical condition deteriorated to the point of developing severe pressure ulcers that progressed into necrotic wounds, resulting in overwhelming infection and complications. These injuries ultimately led to paralysis and total dependency, rendering Plaintiff unable to perform even the most basic activities of daily living. Additionally, Defendants' neglect caused Plaintiff to experience substantial weight loss,

extreme malnutrition, and severe dehydration. These injuries subjected Plaintiff to relentless physical pain, profound mental suffering, and a debilitating psychological state, leaving him in severe distress before his eventual transfer to another facility. Defendants' deliberate indifference not only exacerbated Plaintiff's condition but also inflicted enduring physical and psychological harm

**WHEREFORE**, Plaintiff, by and through undersigned counsel, prays for judgment against Defendants, jointly and severally, in such amounts as are fair and reasonable to compensate Plaintiff for his damages incurred, for his costs herein incurred, and for such other relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

By:     *Jill Harper*

**RON NETEMEYER**, #49409
**JILL HARPER**, #65892
Harper, Evans, Hilbrenner & Netemeyer
401 Locust St. – Ste. 401
Columbia, MO 65201
Phone: (573) 442-1660
Fax: (573) 875-8961
Email: rnetemeyer@lawmissouri.com
Email: jharper@lawmissouri.com
*Attorneys for Plaintiff*